UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JACOB KLEMP,

                Petitioner,

                                    CASE NO. 04-CV-71862-DT

v.                                HONORABLE ARTHUR J. TARNOW

PAUL RENICO,

                Respondent.

_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS[1]

I.    Introduction

      Michigan prisoner Jacob Klemp ("Petitioner") has filed a *pro se* petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 asserting that he is being held in violation of his constitutional rights.  Petitioner is currently confined at the Earnest C. Brooks Correctional Facility in Muskegon Heights, Michigan.[2]  Petitioner is serving a term of life imprisonment without the possibility of parole for a first-degree murder conviction imposed by the Kent County Circuit Court in 1999.  In his pleadings, Petitioner raises claims concerning the jury instructions, the sufficiency of the evidence, prosecutorial misconduct, the effectiveness of trial counsel, a limitation on the cross-examination of a

---

[1]Staff Attorney Cheryl Takacs Bell provided quality research assistance.

[2]At the time he filed his petition, Petitioner was incarcerated at the St. Louis Correctional Facility in St. Louis, Michigan where Respondent Paul Renico is the warden.

witness, and the effectiveness of appellate counsel.  For the reasons set forth below, the

Court denies the petition for writ of habeas corpus.

II.    Facts

Petitioner's convictions arise from the death of Randall Sluiter on June 21, 1998.

At trial, Cregg Campbell testified that he was living in a house on Godfrey Street in

Wyoming, Michigan with Petitioner, Sean Eman, and Jeff DeGabriele in June, 1998.  On

the night of June 20, 1998, his housemates went out drinking.  When they returned home,

they were outside drinking with two other men.  Petitioner began arguing with one of

those men.  Petitioner then retrieved a wooden board from the house and hit the man

twice over the head.  Campbell saw the man collapse before he went into the house and

went to bed.  He did not see Petitioner again.  Campbell testified that all of the men

appeared to be intoxicated.  Campbell admitted that, when he was arrested, he initially

lied to police about the evening's events.

Jeff DeGabriele testified that he went to the Attic Bar with Sean Eman on the night

of June 20, 1998.  They met Randall Sluiter at the bar and then went to Sluiter's home

around 2:15 a.m. for more drinks.  Eventually, the men walked to the house on Godfrey

Street and continued drinking outside where they were joined by Joshua Piper.  When an

argument ensued between Piper and Sluiter, Petitioner came outside, asked if there were a

problem, and then said, "Motherfucker I'm going to make a problem."  DeGabriele heard

Klemp v. Renico
04-CV-71862-DT
Page 3

two blows and saw Sluiter fall.  As DeGabriele ran into the house, he heard Petitioner

say, "take his wallet."  Later, DeGabriele looked outside and saw a wooden board on the

steps, which he put in his car.  He then saw Piper and Eman standing by Petitioner's car

with Sluiter's body.  When he looked outside again, he saw Petitioner close the car's

trunk and tell Piper to get in the car.  DeGabriele then went to bed.

When DeGabriele awoke around noon, he saw Piper sleeping on the living room

couch, but did not see Petitioner.  That evening, Eman cleaned the blood from the porch

and sidewalk with a mop.  DeGabriele moved the wooden board from his car to the

basement of the house.  DeGabriele also testified that Eman wrote him a note which said:

"Jeff, no one came home from the bar with us.  I went straight to bed and there was only

you, Jake, Josh, and Cregg here."

On cross-examination, defense counsel questioned DeGabriele about two police

statements he made.  In each statement, DeGabriele said that Sluiter had offered him and

Eman money to "knock off" a man named Jimmy and that Eman had given Sluiter a code

word to use when he wanted the murder committed.  At trial, DeGabriele testified that he

could not recall the conversation or making the statements to police.

Sean Eman testified pursuant to an agreement in which he pleaded guilty to

second-degree murder with a minimum sentence not to exceed nine years and a

sentencing guideline scoring of 4 to 15 years rather than 8 to 25 years.  Eman testified

3

that he and DeGabriele met Sluiter at the bar and went to Sluiter's home.  Eman did not recall discussing a murder contract with Sluiter.  Eventually, the men went to the house on Godfrey where they were joined outside by Petitioner, Piper, and Campbell.

Petitioner told Eman that Sluiter and Piper were arguing.  Petitioner then came outside with a board and hit Sluiter twice on the head without warning.  Eman testified that he helped move Sluiter to the back of the house, but was unclear about whether he helped put Sluiter in the trunk of Petitioner's car.

The men left in the car with Petitioner driving.  Eman said that he assumed Sluiter was dead and that their intent was to dispose of the body.  After daybreak, the men got out of the car on a dirt road near a pond, where they left Sluiter.  Eman could not recall whether he stomped or kicked Sluiter although blood was found on his shoes.  Eman did not recall Petitioner pouring anti-freeze down Sluiter's throat, but admitted helping Petitioner dump Sluiter's body into the pond.  After disposing of the body, the men returned home and Eman went to bed.  When he awoke, Petitioner was gone.  Eman tried to clean the blood from the porch and sidewalk later that day.  Eman admitted that he was very drunk that evening such that he could not recall details of what transpired.  Eman believed that Petitioner and Piper were also drunk that night.

Joshua Piper testified that he drank about 12 beers at the Attic Bar before going to Petitioner's house and drinking more outside with the other men.  At some point, Sluiter

4

Klemp v. Renico
04-CV-71862-DT
Page 5

began making comments to Piper, trying to pick a fight with him. Piper went into the house and Petitioner told him that Sluiter was annoying him. After Piper went back outside, Petitioner came out with a board and hit Sluiter twice on the head. Petitioner and Eman then dragged Sluiter to Petitioner's car and stomped on his head. Piper denied helping them put Sluiter in the car's trunk. Piper and Eman got into the car and Petitioner drove south. Piper fell asleep and awoke when they stopped in a swampy area. Piper saw Petitioner and Eman beat Sluiter, who was making gurgling noises as he lay behind the car. Petitioner pulled out a bottle that looked like anti-freeze and poured the liquid into Sluiter's mouth. Petitioner and Eman then dragged Sluiter into the pond. Piper admitted that he had been awake for nearly 24 hours at the time of these events, but denied using illegal drugs in the previous 72 hours and denied telling anyone that he had been using cocaine during that time.

Police testimony established that Sluiter's body was found on June 22, 1998 in a pond in Benton Township, Berrien County, Michigan, which is one mile from the Indiana border and approximately 95 miles from Wyoming, Michigan. Police observed marks indicating that Sluiter's body had been dragged from the road to the pond. Police recovered an anti-freeze bottle from the pond. Ethylene glycol (anti-freeze) was found in Sluiter's body and in a stain on the road. Police testimony also established that human

blood stains were found around the house on Godfrey Street, on a board taken from the basement, near the pond, and in Petitioner's car.

Dr. Steven Cohle, the forensic pathologist who performed Sluiter's autopsy, testified that Sluiter had a laceration on the back of his head and temporal bruising consistent with being struck by a board. He also had several lacerations to his face consistent with being kicked, and jaw and hyoid bone fractures which could have been inflicted by kicking or stomping. Dr. Cohle did not believe that these injuries were life-threatening as Sluiter had no skull fractures or brain injuries. Dr. Cohle testified that Sluiter had a potentially fatal blood-alcohol level of 0.34 and a potentially lethal level of ethylene glycol in his system, but the ethylene glycol had not metabolized. Dr. Cohle concluded that Sluiter died from drowning, but that he would have died from ethylene glycol poisoning had he not drowned.

Melanie Vandenheuvel, Petitioner's girlfriend at the time of the incident, testified that she arrived at Petitioner's house around 2:15 a.m. on June 21, 1998 and made mixed drinks for Petitioner and Piper. She stated that Petitioner was already drunk when she arrived. She left before the other men arrived. When she returned to the house to pick up Petitioner at 10:00 a.m., Petitioner was asleep and appeared hung over.

Robin Crawford testified that she went to the Attic Bar with Petitioner on June 20, 1998 and stayed there until 1:30 a.m. She saw Petitioner drink two and one-half mixed

drinks but was not with Petitioner the whole evening.  On June 22, 1998, Petitioner came

to her house in a white car driven by a woman and asked for money and clothes.

Crawford gave Petitioner the items and he and the woman left.

Before trial and during Crawford's testimony, defense counsel sought to admit

testimony from Crawford that Piper had told her that he been awake for 24 hours and had

been using cocaine for 72 hours on the night of the incident.  The trial court found such

testimony to be inadmissible.

Shawna Warden testified that Petitioner called her on June 21, 1998 and told her

that he was in a mess.  She drove Petitioner to South Carolina.  Along the way, Petitioner

cut and dyed his hair.  He also told her about the crime.  According to Ward, Petitioner

explained that Eman brought Sluiter to the house, that Sluiter had become belligerent and

assaultive, that he (Petitioner) hit Sluiter with a piece of wood, and that Sluiter died after

Eman stomped him.  Petitioner, Eman, and Piper took Sluiter's body to a swampy area,

beat it with sticks, and dumped it in a pond.  Warden and Petitioner were arrested in

South Carolina and she was charged with accessary after the fact.  Warden acknowledged

that she was testifying pursuant to an agreement in which she would be sentenced to

probation with no jail time.

At the close of trial, the trial court instructed the jury on the charges offenses and

other matters.  The trial court denied defense counsel's requests for an intoxication

instruction and a factual impossibility instruction (that a person cannot kidnap someone

he thinks is dead).

Following deliberations, the jury convicted Petitioner of first-degree premeditated

murder, first-degree felony murder, and forcible confinement kidnapping, but acquitted

him of larceny.  The trial court sentenced him to life imprisonment without parole on the

felony murder conviction and to 25 to 75 years imprisonment on the kidnapping

conviction, but did not impose a sentence on the premeditated murder conviction.

III.    Procedural History

Following sentencing, Petitioner, through counsel, filed an appeal as of right with

the Michigan Court of Appeals raising claims concerning the jury instructions, the

sufficiency of the evidence, a limitation on the cross-examination of a witness, and

double jeopardy.  The Michigan Court of Appeals affirmed Petitioner's murder

convictions, but remanded for vacation of his kidnapping conviction and correction of the

judgment of sentence to reflect one conviction for first-degree murder under alternate

theories of premeditation and felony murder.  *People v. Klemp*, No. 219079, 2000 WL

33407138 (Sept. 15, 2000) (unpublished).  Petitioner filed an application for leave to

appeal with the Michigan Supreme Court, which was denied.  *People v. Klemp*, 463

Mich. 978, 623 N.W.2d 599 (2001).

Klemp v. Renico
04-CV-71862-DT
Page 9

Petitioner subsequently filed a motion for relief from judgment in the trial court asserting several claim of error, including claims of prosecutorial misconduct and ineffective assistance of trial and appellate counsel.  The trial court denied the motion because the issues were either raised on direct appeal or could have been raised on direct appeal and Petitioner failed to show good cause and actual prejudiced pursuant to Michigan Court Rule 6.508(D)(3).  *People v. Klemp*, No. 98-07681-FC (Kent Co. Cir. Ct. Sept. 5, 2002).  Petitioner filed a delayed application for leave to appeal which was denied for failure to "meet the burden of establishing entitlement to relief under MCR 6.508(D)."  *People v. Klemp*, No. 245883 (Mich. Ct. App. March 27, 2003) (unpublished).  Petitioner filed an application for leave to appeal with the Michigan Supreme Court, which was similarly denied.  *People v. Klemp*, 469 Mich. 998, 675 N.W.2d 593 (2004).

Petitioner filed the instant petition for writ of habeas corpus on June 2, 2004 asserting the following claims as grounds for relief:

I.      He was denied due process when the trial court failed to properly instruct the jury.

      1.      The trial court erred by refusing to give an intoxication instruction after numerous witnesses testified to Petitioner's heavy and apparent intoxication at the time of the alleged offense.

9

2.   The trial court erred in refusing to instruct on the requirement that Petitioner believe or know the victim was alive at the time of confinement and asportation.

II.   There was insufficient evidence to support the kidnapping and felony murder convictions since the undisputed testimony established that the participants believed the victim was dead at the time of confinement and asportation.

III.   He was denied due process and a fair trial by numerous acts of prosecutorial misconduct.

1.   The prosecutor improperly introduced evidence of incarceration.

2.   The prosecutor improperly vouched for the credibility of a witness.

IV.   He was denied the effective assistance of counsel when trial counsel failed to object to the prosecutorial misconduct.

V.   He was denied his right of confrontation when defense counsel was not permitted to cross-examine Joshua Piper with a statement about cocaine use reflecting his ability to recall the charged offense.

VI.   He was denied the effective assistance of counsel on appeal.

Respondent filed an answer to the petition on July 30, 2004 contending that the claims

should be denied for lack of merit and/or based upon procedural default.

IV.   <u>Analysis</u>

A.   <u>Jury Instruction Claims</u>

Petitioner first asserts that he is entitled to habeas relief because the trial court

refused to instruct the jury on intoxication and on factual impossibility (that someone

cannot kidnap a person he believes is dead).  Respondent contends that these claims lack

merit.

In order for habeas corpus relief to be warranted on the basis of incorrect jury

instructions, a petitioner must show more than that the instructions are undesirable,

erroneous or universally condemned; rather, taken as a whole, they must be so infirm that

they rendered the entire trial fundamentally unfair.  *See Henderson v. Kibbe*, 431 U.S.

145, 154 (1977).  State law instructional errors rarely form the basis for federal habeas

corpus relief.  *See Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991).  The failure to give a

defense instruction that is supported by the evidence does not automatically entitle a

petitioner to habeas relief; the failure to instruct must have rendered the petitioner's trial

fundamentally unfair.  *See Maes v. Thomas*, 46 F.3d 979, 984-85 (10th Cir. 1995);

*Nickerson v. Lee*, 971 F.2d 1125, 1137 (4th Cir. 1995).  A failure to instruct does not

deprive a petitioner of fundamental fairness where the instructions as a whole adequately

present the defense theory to the jury.  *See Duckett v. Godinez*, 67 F.3d 734, 743 (9th Cir.

1995).  "An omission, or an incomplete instruction, is less likely to be prejudicial than a

misstatement of the law."  *Henderson*, 431 U.S. at 155.

1.      Intoxication Instruction

As noted, Petitioner claims that the trial court erred in failing to instruct the jury on

the defense of voluntary intoxication as requested.  The Michigan Court of Appeals found

Klemp v. Renico
04-CV-71862-DT
Page 12

that the trial court erred under state law by failing to provide the requested instruction, but

concluded that the error was harmless.  The court stated in pertinent part:

> Initially, we note that the trial court's failure to instruct the jury regarding
> the defense of voluntary intoxication was harmless error with regard to the
> crime of larceny from a person, and was simply not error with regard to the
> crime of forcible confinement kidnapping.  Voluntary intoxication is a
> defense only to specific intent crimes.  *People v Maleski*, 220 Mich App
> 518, 521; 560 NW2d 71 (1997).  Defendant argues that he was entitled to
> an instruction on the voluntary intoxication defense because he was charged
> with larceny from a person, which is a specific intent crime. Because the
> jury acquitted defendant of the larceny charge, we believe that the failure to
> read the requested instruction as to that offense was harmless error.
> Logically, the jury's decision to convict defendant of felony murder must
> have rested on the underlying felony of forcible confinement kidnapping,
> given the acquittal on the larceny charge.  Because forcible confinement
> kidnapping is a general intent crime, *People v Jaffray*, 445 Mich 287, 296;
> 519 NW2d 108 (1994), defendant was not entitled to the requested
> instruction as to the kidnapping charge.  Therefore, as to the crimes of
> larceny from a person and forcible confinement kidnapping, we disagree
> with defendant's contention that the trial court's failure to read a jury
> instruction regarding the defense of voluntary intoxication constituted error
> requiring reversal.
>
> Nevertheless, the crime of first-degree murder, of which defendant was
> convicted, is a specific intent crime, because the defendant must commit the
> offense with the intent to kill the victim.  *People v Lloyd*, 459 Mich 433,
> 444; 590 NW2d 738 (1999).  A successful voluntary intoxication defense
> can reduce this offense to second-degree murder.  *Id*. at 447.  Therefore, we
> must decide whether defendant was entitled to a reading of the requested
> instruction regarding the charge of first-degree murder, given the evidence
> presented at trial.
>
> An instruction regarding the defense of intoxication is proper only if the
> facts of the case would allow the jury to conclude that the defendant's
> intoxication was "so great" as to render him incapable of forming the

12

Klemp v. Renico
04-CV-71862-DT
Page 13

requisite intent. *People v Mills*, 450 Mich 61, 82; 537 NW2d 909 (1995),
*mod* 450 Mich 1212 (1995). In this case there was some evidence that
defendant had consumed alcoholic beverages on the night of the incident,
including testimony from his former girlfriend, a bartender, that defendant
appeared to be intoxicated only a short while before the initial assault on the
victim. However, there was no evidence presented at trial that defendant
was so overcome by the effects of his drinking that he could not form the
requisite intent to support his convictions. To the contrary, defendant's
conduct that night belies this assertion.

The testimony at trial indicated that after becoming annoyed with the
victim's conduct, defendant had sufficient control of his abilities to enter the
house, retrieve a board, and then strike the victim twice in the back of the
head, while stating that he was "going to make a problem." After doing so,
defendant was lucid enough to devise and participate in a plan to dispose of
the victim by dragging him to the car, placing him in the trunk and then
driving him, without incident, to a secluded area more than ninety miles
from the scene of the assault. Defendant then was of sufficient mind to
determine that ethylene glycol, an ingredient found in anti-freeze, would be
necessary to hasten his victim's death. Defendant poured that substance into
the victim's mouth, before dragging the victim to a nearby pond and
pushing him under the water, where the victim drowned. In addition to
these facts tending to show that defendant was not so overcome by the
effects of his drinking as to be unable to form a specific intent to commit
the crime of first-degree murder, defendant remembered many of the details
regarding the crime and confessed those details to Shawna Warden shortly
after committing the offense, while she aided defendant in fleeing the state.

Accordingly, because there was no evidence in the record that defendant
was so overcome by the effects of his drinking that he could not form the
requisite intent to support his conviction of first-degree murder, we will not
reverse his convictions based on the trial court's failure to instruct the jury
regarding the voluntary intoxication defense.

*Klemp*, 2000 WL 33407138, *1-2.

13

Klemp v. Renico
04-CV-71862-DT
Page 14

Having reviewed the record, this Court concludes that the Michigan Court of

Appeals' decision is neither contrary to Supreme Court precedent nor an unreasonable

application thereof.  For purposes of federal habeas review, a constitutional error that

implicates trial procedures is considered harmless if it did not have a "substantial and

injurious effect or influence in determining the jury's verdict."  *Brecht v. Abrahamson*,

507 U.S. 619, 637 (1993); *see also O'Neal v. McAninch*, 513 U.S. 432, 445 (1995)

(habeas court should grant petition if it has "grave doubt" about whether trial error had

substantial and injurious effect or influence upon jury's verdict).  An improper jury

instruction is subject to harmless error analysis.  *See, e.g., Neder v. United States*, 527

U.S. 1, 10-12 (1999) (citing cases).  Given the testimony presented at trial, discussed

*supra*, any error in failing to instruct the jury on voluntary intoxication was harmless.

The witness testimony of DeGabriele, Eman, and Piper recounting Petitioner's conduct at

the time of the offense established that Petitioner was sufficiently cognizant of his actions

and was able to form the specific intent to commit murder despite his level of

intoxication.  Petitioner struck and assaulted Suiter at the house and the pond, placed

Suiter in the car trunk, drove more than 90 miles, poured anti-freeze down Sluiter's throat

and dumped him in a pond.  Moreover, the court did instruct the jury on specific intent as

relevant to the charges offenses.  Given these circumstances, it cannot be said that the

trial court's failure to instruct the jury on voluntary intoxication rendered Petitioner's trial

14

fundamentally unfair or had a substantial and injurious effect or influence on the jury's

verdict.  Habeas relief is not warranted on this claim.

> 2.    Impossibility Instruction

Petitioner also claims that the trial court should have instructed the jury on factual

impossibility, namely that he could not kidnap someone he believed was dead.  The

Michigan Court of Appeals found it unnecessary to address this claim based upon its

determination that sufficient evidence was presented to support the kidnapping

conviction.  *See Klemp*, 2000 WL 33407138 at *5; *see* discussion *infra*.

Accordingly, the Court will conduct an independent review of this claim.  *See*

*Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).  This independent review requires the

federal court to "review the record and applicable law to determine whether the state

court decision is contrary to federal law, unreasonably applies clearly established law, or

is based on an unreasonable determination of the facts in light of the evidence presented."

*Id*.  This independent review "remains deferential because the court cannot grant relief

unless the state court's result is not in keeping with the strictures of the AEDPA."  *Id*.

Having conducted an independent review, the Court finds that the Michigan Court

of Appeals' decision is neither contrary to federal law nor an unreasonable application

thereof or the facts.  As discussed *infra*, the jury could have reasonably determined that

Petitioner believed that Suiter was alive when he put Suiter in the trunk and/or that

Klemp v. Renico
04-CV-71862-DT
Page 16

Petitioner committed the crime of forcible confined kidnapping once they reached the pond. Petitioner has not shown that the trial court's refusal to instruct the jury on factual impossibility rendered his trial fundamentally unfair or had a substantial and injurious effect or influence on the jury's verdict. This is particularly so given that Petitioner was also convicted of first-degree murder under the alternate theory of premeditation. Habeas relief is not warranted on this claim.

      B.     <u>Sufficiency of the Evidence Claim</u>

Petitioner next claims that he is entitled to habeas relief because the prosecution presented insufficient evidence to support his kidnapping conviction and thus his felony murder conviction. Specifically, Petitioner asserts that the prosecution failed to establish that he acted with the intent to confine Sluiter "against his will" because Petitioner believed that Sluiter was already dead when he put him in the trunk of his car. Petitioner relies upon the New York case of *People v. Miles*, 23 N.Y.2d 527, 536-37, 245 N.E.2d 688 (1969), in making this claim. Respondent contends that this claim lacks merit.

In *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), the United States Supreme Court established that a federal court's review of a sufficiency of the evidence claim must focus on whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

16

Under Michigan law, a person who commits murder during the perpetration of a felony is guilty of first-degree murder.  *See* Mich. Comp. L. § 750.316.  The elements of felony murder are:  (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result [i.e., malice], (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in the statute.  *People v. Carines*, 460 Mich. 750, 759, 597 N.W.2d 130 (1999).  The facts and circumstances of the killing may give rise to an inference of malice, including evidence that the defendant used a deadly weapon.  *Id.*

The elements of a forced confinement kidnapping are:  (1) forcible confinement of the victim within the state; (2) done willfully, maliciously, and without lawful authority; (3) against the will of the victim; and, 4) an asportation of the victim which is not merely incidental to an underlying crime unless the crime involves murder, extortion or taking a hostage.  Asportation incidental to these types of crimes is sufficient asportation for a kidnapping conviction.  *See* Mich. Comp. L. § 750.349; *People v. Wesley*, 421 Mich. 375, 388, 365 N.W.2d 692 (1984).

In this case, the Michigan Court of Appeals found that the prosecution presented sufficient evidence to support Petitioner's convictions, stating in relevant part:

Viewing the evidence presented at trial in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found beyond a reasonable doubt that defendant believed the victim was still alive when loaded into the trunk of defendant's car.  Unlike the situation in Miles, there was nothing in the testimony presented at defendant's trial from which it could be inferred that defendant possessed a belief that the victim was dead at the time he was placed inside the trunk of the car.  Defendant did not himself testify at trial and although both Piper and Eman testified as to their own belief that the victim had expired before the trip to Benton Township, this evidence does nothing to shed light on what defendant himself believed at that time.  Similarly, no witness at trial offered testimony concerning statements made or actions taken by defendant which would be consistent with a belief by defendant that the victim was no longer alive at that time.  In fact, contrary to an affirmative finding on that issue. Piper testified that immediately before the victim was placed into the trunk of the car, defendant participated in "stomping" on the victim's head, a futile and useless gesture for one who in fact believed the target of his attack to be deceased.

Further, even if defendant did believe that the victim was dead when he was placed in the trunk of defendant's car, we believe that a rational trier of fact could have found beyond a reasonable doubt that defendant knew the victim was still alive when removed from the trunk of defendant's car.  Because we believe that defendant's actions after that discovery would independently support a conviction of forcible confinement kidnapping, we find further support for our decision that we need not reach the issue decided in the *Miles* case.

After defendant drove a significant distance in his car, with Piper and Eman in the passenger compartment and the victim locked inside the trunk, defendant stopped in a swampy area near an irrigation pond on a farm in Berrien County, near the Indiana border.  Piper testified that the victim was removed from the trunk and placed on the ground near the rear of the vehicle, and that the victim was making gurgling noises at that time.  This testimony supports a finding that the victim was still alive at this point.

Piper testified that defendant proceeded to beat the victim with a stick, and then pulled a bottle of anti-freeze from the trunk of the car and poured it into the victim's mouth.  Piper then witnessed defendant drag the victim toward a pond.  Eman supplemented Piper's testimony, stating that defendant dragged the victim approximately fifteen feet into the pond, where he attempted to push the victim below the surface of the water.  Finally, the forensic pathologist who autopsied the victim's body testified that the likely cause of the victim's death was drowning.  Defendant's actions after arriving at the pond further support a finding that defendant knew the victim was alive at this point in time.

The prosecution argues that defendant's actions after he removed the victim from the trunk of his car constitute the crime of kidnapping.  Defendant responds by arguing that the victim was not "secretly confined" when dragged from the trunk of the car to the pond, and therefore defendant's conduct after arriving at the irrigation pond is insufficient to support a conviction of kidnapping.  However, defendant fails to recognize the distinction between forcible confinement kidnapping and secret confinement kidnapping.  In order to convict defendant of forcible confinement kidnapping, based on his actions after arriving at the irrigation pond, the jury needed only have concluded that defendant (1) forcibly confined the victim, (2) willfully, maliciously and without lawful authority, (3) against the victim's will.  *Wesley, supra* at 389.  The prosecution was not required to prove that the defendant "secretly confined" the victim.  *Id.* Further, the prosecution was not required to prove asportation separate from that required to murder the victim.  *Id.* at 388.  Viewed in the light most favorable to the prosecution, we believe that a rational jury could have found, beyond a reasonable doubt, that defendant committed a forcible confinement kidnapping after he removed the victim from the trunk of his car, when he knew the victim was still alive.

*Klemp*, 2000 WL 33407138 at *3-4.

The Michigan Court of Appeals' decision is neither contrary to Supreme Court

precedent nor an unreasonable application thereof.  The prosecution presented sufficient

evidence that Petitioner forcibly confined Sluiter against his will by placing him in the car

trunk.  Although Eman and Piper testified that they believed Sluiter was already dead,

there was no evidence presented that Petitioner shared this belief.  The jury could

reasonably infer that Petitioner thought that Sluiter was still alive based upon Piper's

testimony that Petitioner stomped on Sluiter's head just before placing him in the trunk.

To the extent that Petitioner challenges the inferences that the jury drew from the

testimony presented at trial and the weight to be accorded certain pieces of evidence, he is

not entitled to relief.  It is well-settled that "[a] federal habeas corpus court faced with a

record of historical facts that supports conflicting inferences must presume - even if it

does not affirmatively appear in the record - that the trier of fact resolved any such

conflicts in favor of the prosecution, and must defer to that resolution." *Walker v. Engle*,

703 F.2d 959, 969-70 (6th Cir. 1983).  Additionally, as explained by the state court, the

jury could have reasonably found that Petitioner knew that Sluiter was alive when he

removed Sluiter from the trunk and carried him to the pond so as to support Petitioner's

convictions for forcible confinement kidnapping and felony murder.[3]  Habeas relief is not

warranted on this claim.

      C.      <u>Prosecutorial Misconduct Claims</u>

      Petitioner next asserts that he is entitled to habeas relief because the prosecutor

engaged in misconduct by introducing evidence of incarceration and by vouching for a

witness's credibility.  Respondent contends that these claims are barred by procedural

default.

      1.      <u>Procedural Default</u>

      Federal habeas relief may be precluded on claims that a petitioner has not

presented to the state courts in accordance with the state's procedural rules.  *See*

*Wainwright v. Sykes*, 433 U.S. 72, 85-87 (1977); *Couch v. Jabe*, 951 F.2d 94, 96 (6th Cir.

1991).  A petitioner's procedural default in the state courts will preclude federal habeas

review if the last state court rendering a judgment in the case rested its judgment on the

procedural default.  *Wainwright*, 433 U.S. at 85; *Coleman v. Mitchell,* 244 F.3d 533, 539

(6th Cir. 2001).  In such a case, a federal court must determine not only whether a

---

      [3]The Court notes that even if there were insufficient evidence of forcible confinement kidnapping to sustain Petitioner's first-degree murder conviction under the felony murder theory, there was ample support his first-degree murder conviction under a premeditation theory, including the witness testimony that Petitioner intentionally struck Sluiter twice on the head with wooden board, that he stomped and hit Sluiter, that he poured anti-freeze down Sluiter's throat, and that he then dumped Sluiter into a pond.

Klemp v. Renico
04-CV-71862-DT
Page 22

petitioner has failed to comply with state procedures, but also whether the state court

relied on the procedural default or, alternatively, chose to waive the procedural bar.  "A

procedural default does not bar consideration of a federal claim on either direct or habeas

review unless the last state court rendering a judgment in the case 'clearly and expressly'

states that its judgment rests on a state procedural bar."  *Harris v. Reed*, 489 U.S. 255,

263-64 (1989).  The last *explained* state court judgment should be used to make this

determination.  *Ylst v. Nunnemaker*, 501 U.S. 797, 803-05 (1991).  If the last state

judgment is a silent or unexplained denial, it is presumed that the last reviewing court

relied upon the last reasoned opinion.  *Id.*

    Even assuming that Petitioner's prosecutorial misconduct claims are defaulted, it is

necessary to consider the merits of those claims.  Here, both the Michigan Court of

Appeals and the Michigan Supreme Court denied Petitioner's applications for leave to

appeal the denial of his motion for relief from judgment based upon his failure to comply

with Michigan Court Rule 6.508(D).  That rule provides, in part, that a court may not

grant relief to a defendant if the motion for relief from judgment alleges grounds for relief

which could have been raised on direct appeal, absent a showing of good cause for the

failure to raise such grounds previously and actual prejudice resulting therefrom.  *See*

Mich. Ct. R. 6.508(D).  The state courts' decisions, while brief, were based upon an

independent and adequate state procedural rule.  *See Simpson v. Jones*, 238 F.3d 399, 407

(6th Cir. 2000).  The record reveals that the trial court denied relief on these issues because Petitioner failed to establish cause for not raising the claims on direct appeal and resulting prejudice.  *Cf. Abela v. Martin*, 380 F.3d 915, 922-23 (6th Cir. 2004) (Michigan Supreme Court's reference to MCR 6.508(D) may not be clear procedural default when lower court denies relief on the merits).

A state prisoner who fails to comply with a state's procedural rules waives the right to federal habeas review absent a showing of cause for noncompliance and actual prejudice resulting from the alleged constitutional violation, or a showing of a fundamental miscarriage of justice.  *See Coleman v. Thompson*, 501 U.S. 722, 753 (1991); *Gravley v. Mills*, 87 F.3d 779, 784-85 (6th Cir. 1996).

In this case, Petitioner asserts that appellate counsel was ineffective for failing to raise his prosecutorial misconduct claims on direct appeal, which could constitute cause to excuse his procedural default.  *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  Even assuming that Petitioner can establish cause to excuse his default, however, he cannot demonstrate actual prejudice.  As set forth below, Petitioner's prosecutorial misconduct claims lacks merit and do not warrant habeas relief.

Moreover, Petitioner has not established that a fundamental miscarriage of justice has occurred.  The miscarriage of justice exception requires a showing that a

23

constitutional violation probably resulted in the conviction of one who is actually innocent. *Schlup v. Delo,* 513 U.S. 298, 326-27 (1995).  "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 624 (1998).  "To be credible, [a claim of actual innocence] requires petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial." *Schlup*, 513 U.S. at 324.  Petitioner has made no such showing.  His prosecutorial misconduct claims are thus barred by procedural default, are otherwise without merit (as discussed *infra*), and do not warrant relief.

2.     Merits

It is well-settled that prosecutors must "refrain from improper methods calculated to produce a wrongful conviction." *Berger v. United States*, 295 U.S. 78, 88 (1935).  To prevail on a claim of prosecutorial misconduct, a habeas petitioner must demonstrate that the prosecutor's remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).  The reviewing court's focus is on "'the fairness of the trial, not the culpability of the prosecutor.'" *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (quoting *Serra*, 4 F.3d at 1355).

The United States Court of Appeals for the Sixth Circuit has adopted a two-part test for determining whether prosecutorial misconduct violates a defendant's due process rights. *See Macias v. Makowski*, 291 F.3d 447, 452 (6th Cir. 2002) (citing cases). First, the court must determine whether the challenged statements were indeed improper. *Id.* at 452. Upon a finding of impropriety, the court must decide whether the statements were flagrant. *Id.* Flagrancy is determined by an examination of four factors: 1) whether the statements tended to mislead the jury or prejudice the accused; 2) whether the statements were isolated or among a series of improper statements; 3) whether the statements were deliberately or accidentally before the jury; and 4) the total strength of the evidence against the accused. *Id.*; *see also Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000) (citing *United States v. Francis*, 170 F.3d 546, 549-50 (6th Cir. 1999)). "[T]o constitute the denial of a fair trial, prosecutorial misconduct must be 'so pronounced and persistent that it permeates the entire atmosphere of the trial,' or 'so gross as probably to prejudice the defendant.'" *Pritchett*, 117 F.3d at 964 (citations omitted).

a.      Reference to Pre-trial Confinement

Petitioner first claims that the prosecutor erred by eliciting evidence of his incarceration through the testimony of Sean Eman. During trial, Eman testified that Petitioner threatened him while they were in jail prior to trial after Eman agreed to testify for the prosecution pursuant to a plea agreement. The prosecution did not err in soliciting

this testimony as it was relevant to Eman's credibility.  Further, the fact that Eman

referenced Petitioner's pre-trial confinement did not render Petitioner's trial

fundamentally unfair.  As aptly stated by the United States Court of Appeals for the Sixth

Circuit:

> Jurors in a criminal case, even in the absence of a statement regarding the
> defendant's custodial detention during trial, are likely to presume that a
> criminal defendant, irrespective of his or her guilt or innocence, has spent at
> least some time in custody as a result of being charged with a crime,
> particularly one such as murder.  Thus, it does not appear that the
> prosecution's eliciting of a passing reference to [the petitioner's] pre-trial
> incarceration impacted [the petitioner's] right to a presumption of innocence
> or was so fundamentally unfair as to require reversal....

*Burton v. Renico*, 391 F.3d 764, 778 (6th Cir. 2004).  Additionally, given the significant

evidence of Petitioner's guilt presented at trial, any error by the prosecution in eliciting

this testimony was harmless under *Brecht, supra*, 507 F.3d at 637.  Habeas relief is not

warranted on this claim.

### b.   Vouching for Witness Credibility

Petitioner also asserts that the prosecution improperly vouched for Shawna

Warden's credibility by eliciting testimony that her plea agreement required her to testify

truthfully.  It is well-settled that a prosecutor may not vouch for the credibility of

witnesses by indicating a personal belief in their truthfulness.  Improper vouching may

occur when a prosecutor argues that a witness testifying pursuant to a plea agreement is in

26

Klemp v. Renico
04-CV-71862-DT
Page 27

jeopardy if the court or government does not find his or her testimony to be truthful.

*United States v. Carroll*, 26 F.3d 1380, 1388 (6th Cir. 1994). A prosecutor, however, does

not engage in misconduct by referring to a testifying witness' plea agreement, by eliciting

testimony about the agreement's terms, or by referencing the agreement to deflect the

defendant's use of the agreement to attack the witness' credibility. *United States v.*

*Francis*, 170 F.3d 546, 550 (6th Cir. 1999). The potential for impropriety only emerges

when a prosecutor explains that there is to be a recommendation to the sentencing court

whether the terms of the plea agreement have been adhered to because it is easy for the

prosecutor to imply that he or she is in a special position to ascertain whether the witness

is testifying truthfully. *Id.* (citing *Carroll*, 26 F.3d at 1387).

In this case, the record shows that the prosecutor elicited testimony about

Warden's plea agreement as a means of explaining how she came to testify against

Petitioner. The plea agreement was clearly relevant to her credibility. The prosecutor did

not argue that he or she had any special knowledge of Warden's truthfulness. Under such

circumstances, the prosecutor's questions were appropriate and did not render the trial

fundamentally unfair. Habeas relief is not warranted on these claims.

    D.    <u>Ineffective Assistance of Trial Counsel Claim</u>

27

Petitioner relatedly asserts that he is entitled to habeas relief because trial counsel was ineffective for failing to object to the alleged instances of prosecutorial misconduct. Respondent contends that this claim has been procedurally defaulted and lacks merit.

In *Strickland v. Washington,* 466 U.S. 668 (1984), the United States Supreme Court set forth a two-pronged test for determining whether a habeas petitioner has received the ineffective assistance of counsel.  First, a petitioner must  prove that counsel's performance was deficient.  This requires a showing that counsel made errors so serious that he or she was not functioning as counsel as guaranteed by the Sixth Amendment.  466 U.S. at 687.  Second, the petitioner must establish that the deficient performance prejudiced the defense.  Counsel's errors must have been so serious that they deprived the petitioner of a fair trial or appeal.  *Id.*

With respect to the performance prong, a petitioner must identify acts that were "outside the wide range of professionally competent assistance" in order to prove deficient performance.  *Id.* at 690.  The reviewing court's scrutiny of counsel's performance is highly deferential.  *Id.* at 689.  The court must recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.  *Id.* at 690.

To satisfy the prejudice prong under *Strickland*, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

28

proceeding would have been different." *Id.* at 694.  A reasonable probability is one that is

sufficient to undermine confidence in the outcome.  *Id.*  "On balance, the benchmark for

judging any claim of ineffectiveness must be whether counsel's conduct so undermined

the proper functioning of the adversarial process that the [proceeding] cannot be relied on

as having produced a just result."  *McQueen v. Scroggy*, 99 F.3d 1302, 1311-12 (6th Cir.

1996) (quoting *Strickland*, 466 U.S. at 686).

Given the Court's determination that Petitioner's prosecutorial misconduct claims

are without merit, however, Petitioner cannot establish that trial counsel was deficient

or/and that he was prejudiced by counsel's conduct.  Accordingly, habeas relief is not

warranted on this claim.

E.      Confrontation Claim

Petitioner next asserts that he is entitled to habeas relief because the trial court

violated his confrontation rights by refusing to allow defense counsel to impeach Joshua

Piper with statements Piper made to Robin Crawford.  Respondent contends that this

claim lacks merit.

The Confrontation Clause of the Sixth Amendment guarantees a criminal

defendant the right to confront the witnesses against him.  "The  main and essential

purpose of confrontation is to secure for the opponent the opportunity of cross-

examination."  *Davis v. Alaska*, 415 U.S. 308, 315 (1973).  "Cross-examination is the

principal means by which the believability of a witness and the truth of his testimony are

tested. Subject always to the broad discretion of a trial judge to preclude repetitive and

unduly harassing interrogation, the cross-examiner is not only permitted to delve into the

witness's story to test the witness's perceptions and memory, but the cross-examiner has

traditionally been allowed to impeach, *i.e.*, discredit the witness." *Id.* at 314.

The right of cross-examination, however, is not absolute. "[T]rial judges retain

wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits

on such cross-examination based on concerns about, among other things, harassment,

prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or

only marginally relevant." *Delaware v. VanArsdall*, 475 U.S. 673, 679 (1986); *see also*

*Norris v. Schotten*, 146 F.3d 314, 329-30 (6th Cir. 1998).

The Michigan Court of Appeals determined that this claim lacked merit and/or that

any error was harmless, stating in relevant part:

> "The impeachment of a witness regarding a collateral matter is within the
> sound discretion of the trial court." *People v Wofford*, 196 Mich App 275,
> 281; 492 NW2d 747 (1992). When a witness claims not to remember
> making a prior inconsistent statement, he may be impeached by extrinsic
> evidence of that statement. *People v Jenkins*, 450 Mich 249, 256; 537
> NW2d 828 (1995). Nonetheless, it has long been the rule in this
> jurisdiction that such extrinsic evidence may not be used to impeach a
> witness on a collateral matter, even where such evidence constitutes a prior
> inconsistent statement otherwise admissible under MRE 613(b). *People v
> Rosen*, 136 Mich App 745, 758; 358 NW2d 584 (1984). The purpose of
> this rule is to "avoid the waste of time and confusion of issues that would

Klemp v. Renico
04-CV-71862-DT
Page 31

result from shifting the trial's inquiry to an event unrelated to the offense charged." *People v Guy*, 121 Mich App 592, 604; 329 NW2d 435 (1982).

Contrary to defendant's assertion, Crawford's testimony would not have had a bearing on Piper's capacity to perceive or recall the events which occurred on the night in question.  The testimony which defendant sought to admit merely indicated that Piper had told Crawford that he had been using cocaine during the relevant seventy-two hour period.  Although Piper testified during trial that he did not recall telling this to Crawford, he further indicated that it was possible he made such a statement because he was not always truthful in everything he said while he was at the bar.  Piper nonetheless denied the use of any cocaine that evening, and nothing in Crawford's proposed testimony could have established this to be untrue.  In other words, Crawford was not prepared to offer testimony that she witnessed Piper's use of cocaine, or even that she witnessed circumstances leading to an inference of such use.  She merely would have testified that Piper told her he had used cocaine during that period and Piper had already conceded that he had possibly made that statement.  Thus, the proffered testimony would not have established that Piper's ability to perceive or recall the events in question was in fact impaired as a result of cocaine use.  Accordingly, we find no error in the trial court's decision not to admit the challenged testimony.

Even assuming that the court erred in this regard, we note that Piper's capacity to recount the events of June 21, 1998, had already been significantly called into question by his own testimony that he had consumed approximately 15 to 20 beers, as well as at least one mixed drink, during the course of the evening in question.  Therefore, we do not believe that such error, if any exists, was sufficiently outcome determinative to warrant reversal of defendant's convictions.

*Klemp*, 2000 WL 33407138 at *5-6.

Having reviewed the record, this Court concludes that the Michigan Court of

Appeals' decision is neither contrary to United States Supreme Court precedent nor an

31

unreasonable application thereof.  First, the trial court did not violate Petitioner's

confrontation rights by refusing to allow Robin Crawford to impeach Joshua Piper's

testimony about his cocaine usage.  The evidence could be precluded as improper

impeachment evidence under Michigan law.  Further, Petitioner's confrontation rights

were not violated given that Petitioner had a reasonable opportunity to impeach Piper and

did so effectively.  Thus, the jury was "in possession of sufficient information to make a

discriminating appraisal" of Piper's credibility and ability to recall events on the night in

question.  *See, e, g, United States v. Christian*, 786 F.2d 203, 213 (6th Cir. 1986).  While

the trial court arguably could have exercised its discretion to admit the impeachment

evidence under state law, its failure to do so did not deprive Petitioner of his right of

confrontation.

Second, even assuming that the trial court erred in limiting the cross-examination

of Crawford, such error was harmless under the standard set forth in *Brecht, supra*, 507

U.S. at 637.  *See Delaware v. VanArsdall*, 475 U.S. 673, 684 (1986) (harmless error

analysis applies to Confrontation Clause errors).  The jury was well aware of Piper's

credibility issues.  Further, the prosecution presented other significant evidence of

Petitioner's guilt, including the eyewitness testimony of Campbell, DeGabriele, and

Eman.  The trial court's limitation on cross-examination did not have a substantial or

injurious effect or influence upon the jury's verdict.  Habeas relief is not warranted on

this claim.

     F.     <u>Ineffective Assistance of Appellate Counsel Claim</u>

     Lastly, Petitioner claims that he is entitled to habeas relief because appellate counsel was ineffective for failing to raise the prosecutorial misconduct and ineffective assistance of trial counsel claims on direct appeal.  Respondent contends that this claim lacks merit.

     It is well-established that the right to the effective assistance of counsel includes the right to the effective assistance of appellate counsel.  *See Mapes v. Coyle*, 171 F.3d 408, 427-28 (6th Cir. 1999).  Given the Court's conclusion that the foregoing issues are without merit, however, Petitioner cannot establish that he was prejudiced by appellate counsel's conduct as required by *Strickland, supra.  See Smith v. Robbins*, 528 U.S. at 285-86.  Habeas relief is thus not warranted on this claim.

V.     <u>Conclusion</u>

     For the reasons stated, the Court concludes that Petitioner is not entitled to federal habeas relief on the claims presented in his petition.  Accordingly,

     **IT IS ORDERED** that the petition for writ of habeas corpus is **DENIED**.

                  <u>s/Arthur J. Tarnow</u>
                  ARTHUR J. TARNOW
                  UNITED STATES DISTRICT JUDGE

DATED:  <u>April 19, 2005</u>

Klemp v. Renico
04-CV-71862-DT
Page 34

I hereby certify that a copy of the foregoing document was served upon counsel of record on April 19, 2005, by electronic and/or ordinary mail.

s/Catherine A. Pickles
For Case Manager

34